Claudia L. BOYD, Edgar W. Gnagey, Cordelia B. Green, William S. Hajel, Donna L. Johnson, Sandra Kusch, Larry LaVigne, Joyce D. Stern and William H. Welsh, Appellants

v.

ROCKWOOD AREA SCHOOL DISTRICT, Andreas Demidont and Clair E. Lewis.

Commonwealth Court of Pennsylvania.

Argued June 7, 2006.
Decided Sept. 13, 2006.

Kathryn L. Simpson, Harrisburg, for appellants.

Daniel W. Rullo, Somerset, for appellee, Rockwood Area School District.

A. Martin Herring, Philadelphia, for appellee, Clair E. Lewis.

BEFORE: COLINS, President Judge, and McGINLEY, Judge, SMITH–RIBNER, Judge, FRIEDMAN, Judge, LEADBETTER, Judge, SIMPSON, Judge, and LEAVITT, Judge.

OPINION BY Judge LEAVITT.

Claudia L. Boyd, Edgar W. Gnagey, Cordelia B. Green, William S. Hajel, Donna L. Johnson, Sandra Kusch, Larry LaVigne, Joyce D. Stern and William H. Welsh (collectively Appellants) appeal from an order of the Court of Common Pleas of Somerset County (trial court) dismissing their complaint against the Rockwood Area School District (District) and Clair E. Lewis, President of the Rockwood Education Association (Union) (together Appellees). Appellants claim that the District failed to honor its contractual obligation to provide them with "Plan U" health insurance, which is a type of coverage provided by Blue Cross and Blue Shield, from the day of their retirement until the day they reached the age of Medicare eligibility. The District acknowledged that it agreed to provide Appellants with post-retirement health insurance but not, specifically, Plan U. The District asserted that it agreed simply to continue to include Appellants in the District's program of health insurance for active employees. In addition to asserting breach of contract, Appellants also seek relief under theories of equitable estoppel, intentional interference with a contractual relationship

and fraudulent misrepresentation. Finding no error in the trial court's holding that Appellants' pleading is inadequate to support any of these legal theories, we affirm.

### BACKGROUND

Appellants in this action are retired employees of the District. Appellants fell into two groups depending on whether they were members of the Union. We review separately the facts relevant to each group.

Boyd, Gnagey, Green, Hajel, LaVigne, Stern and Welsh are retired teachers who were members of the Union, which is the exclusive bargaining representative for those District employees included in the bargaining unit.[1] Between 1991 and 2001, the District and the Union entered into three separate CBAs that lie at the heart of the present dispute: the first was effective from July 1, 1991, until June 30, 1994 (1991 CBA); the second from July 1, 1994, until June 30, 1997 (1994 CBA); and the third from July 1, 1997, until June 30, 2001 (1997 CBA).[2] Welsh retired while the 1991 CBA was in effect, and LaVigne retired while the 1994 CBA was in effect. Boyd, Gnagey, Green, Hajel and Stern retired while the 1997 CBA was in effect and under an incentive plan that paid them $21,000 to take early retirement.[3]

It is not disputed that each above-cited CBA obligated the District to provide its active teachers with Plan "U" Blue Cross, Blue Shield and Major Medical insurance (Plan U), or equivalent coverage with another carrier, for the duration of the CBA. According to the complaint, each CBA also obligated the District to provide certain retired teachers, i.e., teachers with thirty years of service at the time of retirement, with Plan U coverage until they became eligible for Medicare. This contractual obligation of the District to retired teachers, it is asserted in the complaint, outlived the term of the CBA.

Appellants Johnson and Kusch were not Union members and, thus, not covered by any of the above-cited CBAs. Nevertheless, Johnson and Kusch assert that they also were entitled to Plan U coverage until they reached the age of eligibility for Medicare. Each asserts a different contract as the basis for this entitlement. Johnson, who served as an administrator until her retirement in 1997, asserts that the District's "administrator's conditions of employment" is the authority for her contract claim. Kusch, who served as a secretary until her retirement in 1996, asserts that the District's written policy for support staff is the authority for her contract claim. Neither the written policy for support staff nor the "administrator's conditions of employment" was appended to Appellants' complaint.

---

1. After they retired, of course, these Appellants ceased to be members of the Union and ceased to participate in contract negotiations.

2. Appellants appended the 1994 and 1997 CBAs to their complaint, but not the 1991 CBA. Appellants aver in their complaint that the 1991 CBA "contained provisions substantially similar" to the 1994 and 1997 CBAs. Complaint, ¶ 49. We must accept the truth of this allegation in considering the Appellees' preliminary objections.

3. The Retirement Incentive Plan offered by the District during the 1998–1999 school year granted a one-time payment of $21,000 to retiring employees who met certain eligibility requirements. The written notice describing the Retirement Incentive Plan stated: "This incentive option shall not be construed to be part of the existing contract between the [District] and the [Union]. All provisions of the current professional contract will remain in effect." Reproduced Record at 73a (R.R. ____). The professional contract then in place was the 1997 CBA.

In 2001, the District and the Union negotiated a new CBA, which was effective from July 1, 2001, until June 30, 2004 (2001 CBA). It is the 2001 CBA that precipitated the present action. The 2001 CBA replaced Plan U for active teachers and *eligible retirees* with another type of Blue Cross and Blue Shield coverage, Select Blue Plan Option I (Select Blue). The 2001 CBA also contained a provision, which had appeared in the prior CBAs, that the District would continue to pay the premiums for this health insurance coverage for qualified retired teachers, *i.e.*, those with thirty years of service, until they became eligible for Medicare.[4]

■ Appellants filed suit against Appellees in federal district court under 42 U.S.C. § 1983, asserting that the change in the 2001 CBA, as applied to each of them, violated their Fifth Amendment rights under the United States Constitution. Appellants also raised several causes of action under state law. The federal district court dismissed the Section 1983 action and de-

clined to exercise supplemental jurisdiction over the state law claims. Thereafter, the United States Court of Appeals for the Third Circuit (Third Circuit) affirmed the district court in *Boyd v. Rockwood Area School District*, 105 Fed. Appx. 382 (3d Cir.2004) (not precedential). In doing so, the Third Circuit reasoned that Appellants "should have known that their health care benefits as retirees were subject to change pursuant to subsequent collective bargaining agreements" between the District and the Union. *Id.* at 385. Finding Appellants' claims to lack merit under applicable contract law principles, the Third Circuit held there was no foundation to Appellants' theory that they had been denied a property right without due process of law.[5]

With the demise of their Section 1983 claim, Appellants then filed their state law claims in a multi-count complaint in the trial court, which is the complaint we consider here. Against the District, Appellants sought relief for breach of contract (Count I) and equitable estoppel (Count

---

**4.** Article V, Paragraph A, of the 2001 CBA provided, in pertinent part:

All employees *and eligible retirees* will be provided with Select Blue Plan Option I for such employee's [sic] and eligible dependent members of his/her family coverage effective July 1, 2001, or as soon thereafter as can be implemented by the Employer. This choice must be made no later than April 15th, immediately prior to the start of each fiscal year, which commences on July 1st. The Employer shall provide and pay the premium in full for Select Blue Plan Option I or, [sic] for equivalent insurance coverage with some other responsible insurance carrier, for each individual employee and the dependent members of his family. The term "equivalent" as used aforesaid shall mean that such alternative insurance plan shall provide coverage equal to or better than the Blue Cross and Blue Shield plan.

R.R. 78a (emphasis added). Article V, Paragraph F of the 2001 CBA provided, in pertinent part:

In the event an employee after thirty (30) years of service in teaching permanently retires from teaching *after [the] date of this contract* and prior to such retiring employee's attaining the age of eligibility for Medicare, the Employer agrees to continue to pay the premiums for such employee's medical insurance coverage benefits under Paragraph 'A' of this Article V above until such employee attains the age of eligibility for Medicare.

R.R. 82a (emphasis added).

**5.** This suggests that Appellees also have a collateral estoppel defense to Appellants' action; however, collateral estoppel must be raised as an affirmative defense. Pa. R.C.P. No.1030(a). It cannot be considered at the preliminary objection stage of the proceeding. *220 Partnership v. Philadelphia Electric Co.*, 437 Pa.Super. 650, 656, 650 A.2d 1094, 1097 (1994).

III); against Lewis they sought relief for intentional interference with contract (Count II) and fraudulent misrepresentation (Count IV).[6] Appellees each demurred to the Counts where named as a defendant, and raised additional preliminary objections to the sufficiency of Appellants' pleadings and Appellants' failure to join the Union as an indispensable party.

■■■ Following the receipt of briefs and hearing oral argument, the trial court sustained Appellees' demurrers and dismissed Appellants' complaint with prejudice. The trial court concluded that Appellants failed to allege facts sufficient to show that they had a vested right to the continuation of the exact health insurance benefits in effect on the day of their retirement, thereby precluding the District from later altering those benefits.[7] In reaching this conclusion, the trial court adopted the Third Circuit's analysis of Appellants' failed Section 1983 claim. Appellants filed a timely appeal to Superior Court, which ultimately issued a decision relinquishing jurisdiction and transferring the case to this Court for review.[8]

Appellants argue that the trial court erred. According to Appellants, their complaint alleged all the elements of breach of contract and equitable estoppel against the District, as well as the elements of interference with contract and fraudulent misrepresentation against Lewis. We address the Appellants' arguments *seriatim*, beginning with the claims against the District (Counts I and III) and concluding with the claims against Lewis (Counts II and IV).

### Breach of Contract (Count I)

In Count I, it is alleged that each Appellant decided to take early retirement based on the District's promise to pay their health insurance costs in accordance with the CBA or with District policies in effect as of the date of his or her retirement until each Appellant became eligible for Medicare. Complaint, ¶ 62.[9] The complaint also alleged that Appellants were "encouraged and assisted by various agents of [the] School District to retire before reaching the age of Medicare eligibility." Complaint, ¶ 56. Appellants maintain that the foregoing averments were sufficient to establish the existence of the District's contractual obligation to provide Appellants with the same health insurance coverage in effect on the date of each Appellant's retirement until they reached the age of

6. Andreas Demidont, Superintendent of the District, was also named as a defendant in the complaint. Appellants subsequently withdrew their claims against Demidont, and he is no longer a party to this action.

7. Absent any basis for this claim, the other counts in the complaint also fell.

8. Our scope of review on appeal from an order sustaining preliminary objections and dismissing a complaint is limited to determining whether the trial court committed legal error or abused its discretion. *In re Estate of Bartol*, 846 A.2d 209 (Pa.Cmwlth.2004). When considering preliminary objections, we must accept as true all well-pled facts set forth in the complaint, as well as all inferences reasonably deducible therefrom, but not

conclusions of law. *Id.* Preliminary objections in the nature of a demurrer should be sustained only where the pleadings are clearly insufficient to establish a right to relief; any doubt must be resolved in favor of overruling the demurrer. *Jacobs v. Merrymead Farm, Inc.*, 799 A.2d 980 (Pa.Cmwlth.2002).

9. Appellants Boyd, Gnagey, Green, Hajel and Stern contend that the Retirement Incentive Plan under which they elected early retirement expressly left all of the 1997 CBA provisions intact. Complaint, ¶¶ 50–53. However, the complaint does not allege that a formal early retirement plan governed the retirement of the other Appellants. In sum, the terms of the Retirement Incentive Plan are not relevant unless we accept Appellants' construction of the 1997 CBA.

Medicare eligibility. Appellants alleged that the District breached this contractual obligation when it ratified the 2001 CBA.

The trial court acknowledged that the complaint established that the District agreed in each relevant CBA to provide qualified retirees with some kind of health insurance until they reached the age of Medicare eligibility. However, the trial court disagreed with Appellants' reading of the CBA, a reading not supported either by the Union or by the District, the parties who had negotiated the CBA. The trial court held that the CBAs did not guarantee Appellants the *exact same coverage* in effect when they retired until they reached Medicare eligibility.

In dismissing Appellants' state law claims, the trial court adopted the Third Circuit's analysis of Appellants' attempted Section 1983 action; in turn, the Third Circuit relied upon its earlier decision in *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, U.A.W. v. Skinner Engine Company*, 188 F.3d 130 (3d Cir. 1999). We begin, therefore, with a review of the principles established in *Skinner*.

In *Skinner*, retired employees brought a class action suit alleging that the employer's termination of their postretirement insurance benefits breached their collective bargaining agreements; violated the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001–1461 (ERISA); and was barred under the doctrine of equitable estoppel. At issue was a provision that appeared in the 1989 collective bargaining agreement under which the employees retired. The provision stated that the "Company *will continue* to provide Blue Cross–Blue Shield hospitalization and surgical coverage, all costs being borne by the Company." *Skinner*, 188 F.3d at 135. When the 1993 collective bargaining agreement was negotiated, employees who had retired prior to 1993 had their medical benefits changed.[10] These retired employees filed suit. According to the retirees, the 1989 collective bargaining agreement provided them with lifetime health insurance on exactly the same terms. Accordingly, changes effected in 1993 breached the 1989 collective bargaining agreement as well as the employer's fiduciary duty under ERISA.

The district court dismissed the suit on summary judgment, and the Third Circuit affirmed. In doing so, the Third Circuit noted that ERISA contains elaborate vesting procedures for pension plans, but it does not require vesting of welfare (*i.e.,* medical) plans. In this regard, the court cautioned,

> it must be remembered that to vest benefits is to render them forever unalterable. Because vesting of welfare plan benefits constitutes an extra-ERISA commitment, an employer's commitment to vest such benefits is not to be inferred lightly and *must be stated in clear and express language.*

Id. at 139 (emphasis added). The court then considered the relevant provisions of the collective bargaining agreements at issue and held, under applicable contract law principles, that the agreements did not unambiguously state that medical benefits would continue unchanged for the life of the retiree but, rather, were terminable by the employer at the expiration of the agreement under which the benefits were provided.[11]

---

10. Retirees lost part of the employer's contribution to the cost of retirees' spousal coverage; their deductible was increased; and they were required to make a co-payment of premium on prescription drug and Medicare supplement coverage. *Id.* at 136.

11. *Skinner* is consistent with our *en banc* opinion in *In re: Appeal of Cumberland Valley*

In the instant case, the trial court found the facts in *Skinner* similar in important respects to the facts before it. The trial court placed particular emphasis on *Skinner's* warning that an employer's contractual commitment to vest benefits must be clearly and expressly stated. Applying this standard to Appellants' complaint, the trial court concluded that Appellants' factual averments fell far short of the mark. Neither the relevant CBA nor the District's Retirement Incentive Plan stated that the District committed to provide Appellants with the same health coverage that was in effect at the time of their retirement. The contrary was stated; as noted by the trial court, the 1997 CBA expressly authorized the replacement of Plan U with a successor health plan. The trial court quoted from the Third Circuit's decision that dismissed Appellants' Section 1983 claim, stating that Appellants "should have known that their health care benefits as retirees were subject to change...." *Boyd v. Rockwood Area School District,* 105 Fed. Appx. 382, 385 (3d Cir.2004) (not precedential).[12] Accordingly, the trial court held that Appellants failed to plead a breach of contract claim.[13]

■■■ To support a claim for breach of contract, a plaintiff must allege: (1) the existence of a contract between the plaintiff and defendant, including its essential terms; (2) a breach of duty imposed by the contract; and (3) damages resulting from that breach of duty. *CoreStates Bank, N.A. v. Cutillo,* 723 A.2d 1053 (Pa.Super.1999). The question in this appeal is whether Appellants can establish the existence of a District duty, stated in "clear and express language," to provide Appellants with whatever package of health insurance benefits they enjoyed on the day of their retirement until they became eligible for Medicare. We agree with the trial court that Appellants' complaint has failed to meet this standard.

In each of the three CBAs at issue in this case, Article V is the provision that established the health insurance benefits for the term of the CBA for both employees and retired employees. Paragraph A

*School District,* 31 Pa.Cmwlth. 407, 376 A.2d 674, 677 (1977), *reversed on other grounds,* 483 Pa. 134, 394 A.2d 946 (1978). In that case we held that as a matter of basic contract law, a collective bargaining agreement that has expired cannot continue to govern the conduct of the parties. Here, the question is whether Plan U coverage survived, for Appellants, after the expiration of the 1997 CBA.

12. Appellants invoked 42 U.S.C. § 1983 and argued that the change in health care coverage implemented by the 2001 CBA violated their Fifth Amendment right to procedural due process. In rejecting Appellants' Section 1983 claim, the Court of Appeals noted that *plaintiffs should have known that their health care benefits as retirees were subject to change pursuant to subsequent collective bargaining agreements between [the District] and the [Union].* The agreement they rely upon for the source of a protected property interest in continued inclusion in Plan U specifically stated that different health care

insurance could be substituted as long as it was equivalent to the Plan U Blue Cross Blue Shield coverage. Thus, they were clearly aware of the possibility of different, though equivalent, health care coverage in the future.
*Id.* at 385 (emphasis added).

13. The trial court dealt separately with the breach of contract claims of Welsh and La-Vigne, who retired under the 1991 CBA and 1994 CBA, respectively, and before the District offered its incentive for early retirement. The trial court also dealt separately with the claims of Johnson and Kusch, who retired pursuant to written policies for support staff and administrators, respectively, and not under a CBA. However, in each case, the trial court sustained the District's demurrer for the same reasons given for dismissing the breach of contract claims of the five other Appellants, *i.e.,* failure to meet the *Skinner* requirements.

of Article V, affecting active employees, stated as follows in the 1994 CBA:

> The Employer shall provide and pay the premium in full for Plan "U" Blue Cross, Blue Shield and Major Medical, including catastrophic (the limit of which catastrophic insurance will be raised *for the balance of the term of this agreement* from $250,000.00 to a $1,000,000.00 limit) insurance coverage, or, for equivalent insurance coverage with some other responsible insurance carrier, for each individual employee and the dependent members of his family. The term "equivalent" as used aforesaid shall mean that such alternative insurance plan shall provide coverages equal to or better than the Blue Cross and Blue Shield plan referred to aforesaid and shall have equal or better acceptability by hospitals and doctors as the Blue Cross and Blue Shield plan referred to aforesaid.

R.R. 36a (emphasis added). The above language was repeated in Paragraph A of Article V in the 1997 CBA. However, a provision was added to the 1997 CBA for the establishment of a Labor–Management Health Care Insurance Committee to develop "a health care program that would be acceptable to the various administrators, Board Members, and staff of [the

District]." R.R. 47a. Once the Committee made its recommendation, the School Board had the right "to implement the health care proposal during the term of the said contract." *Id.* In short, even assuming a reading most favorable to Appellants, the foregoing contractual language indicates that the Plan U coverage contemplated in Paragraph A of Article V was subject to change, either after the "balance of the term" of the 1994 CBA had expired, or during the term of the 1997 CBA, if recommended by the Health Care Insurance Committee.[14]

In each CBA, Article V, Paragraph F addressed retiree benefits and stated that the District would *pay the premium* for whatever coverage was provided for in Paragraph A, or "equivalent coverage," until retirees attained the age of eligibility for Medicare (currently age 65).[15] In the CBAs for 1991, 1994 and 1997, the target coverage was Plan U; in the 2001 CBA the target coverage was Select Blue. In each CBA, the District's obligation set forth in Paragraph F is expressly limited by Paragraph A, which, as demonstrated above, was subject to change each time a new CBA was signed.[16] Paragraph F must be read together with Paragraph A. When one does so, Appellants' claim that they had a "vested" right in Plan U coverage

---

14. As noted previously, the 1991 CBA was not attached to the complaint. The parties are in apparent agreement that the relevant provisions of Article V are substantially similar to the 1994 and 1997 CBAs.

15. Article V, Paragraph F of the 1994 CBA provided, in pertinent part:

> In the event an employee after 30 years of service in teaching permanently retires from teaching after date of this contract and prior to such retiring employee's attaining the age of eligibility for Medicare, the Employer agrees to continue to pay the premiums for such employee's Blue Cross, Blue Shield and major medical or equivalent insurance coverage benefits under

paragraph "A" of this Article V above until such employee attains the age of eligibility for Medicare.

R.R. 37a. The version of Paragraph F in the 1997 CBA is identical.

16. This incorporation of Paragraph A into Paragraph F was beneficial to retirees. Otherwise, the district's premium payment obligation might have been frozen at the level in place on the day the teacher retired. This case is identical to *Skinner* in that Appellants, like the retirees in *Skinner*, were entitled to continued coverage after expiration of the CBA. The terms of that coverage, however, were governed by the replacement CBA.

under any of the CBAs must fail.[17] The District's premium payment obligation to retirees changed as coverage in Paragraph A changed.[18]

■ The analysis on the breach of contract claims of Johnson and Kusch is somewhat different. They also assert a vested right to Plan U coverage; however, the origin of this alleged right was not a CBA but, rather, a written employment policy of the District. Johnson's claim is based upon the District's written "conditions of employment" for administrators. Complaint, ¶ 47. Kusch's claim is based upon the District's "written policy for support staff." Complaint, ¶ 44. The trial court dismissed the contract claims of Johnson and Kusch for the same reason that it dismissed the contract claims of the other Appellants: "[the] averments do not meet the requirements of [*Skinner*] to establish that the School District locked itself in to the exact same insurance coverage plan provided in the Collective Bargaining Agreement in effect at the time of those

plaintiffs retirement." Trial Court Opinion at 6–7.

■ Johnson and Kusch were not members of the Union and, as such, were employees without an enforceable promise of continued employment, let alone a promise of specific employment benefits. *See Batson v. Montgomery County*, 125 Pa. Cmwlth. 251, 557 A.2d 65, 66 (1989) (holding where appellant failed to allege or prove that "written policy statements" limited the county's ability to discharge her, she was an at-will employee); *Stumpp v. Stroudsburg Municipal Authority*, 540 Pa. 391, 658 A.2d 333 (1995) (noting that unless public employee is protected by civil service or by a collective bargaining agreement he is an at-will employee who can be discharged for any reason or no reason). Johnson and Kusch did not attach the written District policies that allegedly established their contractual right to Plan U coverage until they reached the age of Medicare eligibility.[19] Notably, the other

---

**17.** The dissent acknowledges the language incorporating Paragraph A into Paragraph F but then inexplicably refuses to read the two provisions together. Instead, the dissent would read Paragraphs A and F separately, leading to the absurd and surely unintended result of retirees being guaranteed a level of health insurance coverage different from, and presumably better than, that afforded to currently employed teachers. By incorporating Paragraph A into Paragraph F, the drafters of the CBA intended to place retirees in the same position as current employees. Thus, as explained above, as coverage under Paragraph A was subject to change for current employees, it was also subject to change for Appellants.

Appellants, like the dissent, ignore the words that incorporate Paragraph A into Paragraph F or treat them as surplusage. *In Morris v. American Liability & Surety Co.*, 322 Pa. 91, 94, 185 A. 201, 203 (1936), our Supreme Court held: "[I]t is a well-settled rule of construction that no word in a contract is to be treated as surplusage or redundant if

any reasonable meaning consistent with the other parts can be given to it."

**18.** It would have been quite easy to draft language to conform to what Appellants seek: "eligible retirees shall receive Plan U coverage until they reach the age of eligibility for Medicare." Such language would meet the standard of "clear and express language." *Skinner*, 188 F.3d at 139.

**19.** The District and Lewis filed preliminary objections to deficiencies in Appellants' pleadings under the following rules of civil procedure: Pa. R.C.P. No. 1028(a)(2) (failure of a pleading to conform to law or rule of court, in this case Pa. R.C.P. No. 1019 by, *inter alia*, failing to plead with adequate specificity and by failing to attach a copy of the alleged writings upon which the claim is based); and Pa. R.C.P. No. 1028(a)(3) (insufficient specificity in a pleading). Pa. R.C.P. No. 1019(a) requires plaintiffs to plead the material facts that support the claims. A complaint is sufficiently specific if it provides enough facts to enable the defendant to frame a proper an-

Appellants did attach a copy of the relevant written document on which they based their contract claims.

Johnson and Kusch have a tougher burden on their breach of contract claim than the other Appellants. First, they were employees at will without any expectation of employment rights. Second, although Johnson and Kusch make the bald assertion that they have contract rights under "written District policies," they did not attach these written documents to their complaint. *A fortiori*, Johnson and Kusch have failed to plead that by clear and express language the District contractually obligated itself to provide them Plan U coverage until they reached the age of Medicare eligibility.

For these reasons, we uphold the trial court's dismissal of Count I of the complaint.

**Equitable Estoppel (Count III)**

■ As to equitable estoppel, Appellants' complaint alleged that: the District misrepresented that it would provide medical insurance in accordance with the CBAs or policies for support staff/administrators; the District used the offers of specified medical insurance benefits to induce Appellants to retire; Appellants relied on the District's misrepresentations to their detriment; and Appellants' reliance on the District's misrepresentations was reasonable. Complaint ¶¶ 113, 115, 117, 118. Appellants maintain that with these allegations, they adequately alleged all the required

elements of equitable estoppel. We disagree.

■ To establish equitable estoppel, a party must prove: (1) intentional or negligent misrepresentation of some material fact; (2) made with knowledge or reason to know that the other party would rely upon it; and (3) inducement of the other party to act to its detriment because of justifiable reliance on the misrepresentation. *Reform Congregation Oheb Sholom v. Berks County Board of Assessment Appeals*, 839 A.2d 1217 (Pa.Cmwlth.2004), *appeal denied*, 578 Pa. 691, 849 A.2d 1206 (2004).

As the trial court correctly observed, Appellants' equitable estoppel claim is premised upon their ongoing contention that the 2001 change in health care insurance from Plan U to Select Blue violated the District's contractual obligation to them. Appellants advance that contention one step further by alleging that the District's alleged promise to continue their health insurance constituted an "intentional or negligent" misrepresentation. To satisfy that allegation, Appellants needed to aver material facts showing that the District either actually knew or should have known that there would be a change of coverage in the upcoming CBA when Appellants made the decision to retire. No such facts were averred in the complaint.

Therefore, we agree with the trial court that Appellants failed to plead material facts necessary to sustain a cause of action

swer and prepare a defense. *Commonwealth ex rel. Milk Marketing Board v. Sunnybrook Dairies Inc.*, 29 Pa.Cmwlth. 210, 370 A.2d 765 (1977). Moreover, Pa. R.C.P. No. 1019(i) provides that, when a claim is based upon a writing, the pleader shall attach a copy of the writing to the complaint or, in the event that the writing is not accessible, the pleader shall state as much, together with the reason. Based on the plain language of the complaint,

the claims of Appellants Johnson and Kusch are based in part upon written agreements between these Appellants and the District; nevertheless, the complaint neither attaches these agreements nor explains why they are not provided. The trial court did not rule on these preliminary objections because they were held to be mooted by the dismissal of the complaint.

under the doctrine of equitable estoppel. Accordingly, we affirm the dismissal of Count III of Appellants' complaint.

### Intentional Interference With Contract (Count II)

The complaint alleged that: Lewis encouraged and assisted Appellants Boyd, Gnagey, Green, Hajel and Stern to retire before reaching the age of Medicare eligibility; Lewis represented to them that, in exchange for their early retirement, the District would continue to provide health insurance in accordance with the 1997 CBA; and the decision of these Appellants to elect early retirement was predicated on that promise. Complaint, ¶¶ 54, 59, 62. The complaint further alleged that, despite Lewis' knowledge of Appellants' rights under their early retirement agreements, he intentionally interfered with those rights by: (1) directing that the 2001 CBA include the language "eligible retirees" in Article V, Paragraph A, despite the fact that such language was not approved by the rank and file of the Union; (2) suppressing any support of Appellants by the Union; and (3) convincing the Board of Directors to ratify his conduct. Complaint, ¶¶ 87–91, 104–09, 111.

The elements of a cause of action for intentional interference with contract, as set forth in *Strickland v. University of Scranton,* 700 A.2d 979, 985 (Pa.Super.1997), are:

(1) the existence of a contractual ... relation between the complainant and a third party;

(2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring;

(3) the absence of privilege or justification on the part of the defendant; and

(4) the occasioning of actual legal damage as a result of the defendant's conduct.

Even accepting the allegations against Lewis as true, as we must at the preliminary objection stage of the proceedings, we find that Appellants' pleading fails the *Strickland* test because it is premised upon an alleged contractual obligation of the District that we have already determined did not exist. The District did not agree to provide Appellants with Plan U coverage until they reached Medicare eligibility.

Further, the complaint makes no allegation of purposeful action by Lewis intending to harm contractual relations between the District and Johnson, Kusch, LaVigne and Welsh. Indeed, Appellants appear to accept that the claims against Lewis are insufficient with respect to these four individuals.[20] Moreover, for the reasons set

---

**20.** For example, in the Summary of the Argument section of their brief, Appellants state that they adequately allege causes of action against Lewis for interference with contract and fraudulent misrepresentation because Lewis "encouraged and assisted *certain* of the Appellants to take early retirement by making false representations concerning the continuing nature of the medical benefits and then by working to eliminate those benefits." Appellants' Brief at 11 (emphasis added). Further, in the Argument portion of their brief pertaining to intentional interference with contract, Appellants state that they "have alleged that

Lewis interfered with their contractual rights to specified health insurance benefits as secured by the CBA in effect when *Appellants Gnagey, Boyd, Green, Stern and Hajel* retired." Appellants' Brief at 19 (emphasis added). Finally, in the Argument portion of their brief regarding fraudulent misrepresentation, Appellants contend that they set forth a cause of action for fraudulent misrepresentation against Lewis by alleging "that Lewis made false representations concerning the continuing nature of specific health care benefits in inducing *Appellants Gnagey, Boyd, Green,*

forth above, Appellants LaVigne and Welsh could not have asserted a cognizable intentional interference with contract claim based on Article V of the 1991 CBA or 1994 CBA. Like the 1997 CBA, neither of those agreements bound the District to provide Plan U coverage to retirees. In short, Appellants failed to state a cognizable claim for intentional interference with contract, and the trial court properly dismissed Count II of the complaint.

### Fraudulent Misrepresentation (Count IV)

 The complaint alleged that Lewis represented to certain Appellants[21] that the District would continue to pay for Plan U benefits if they took early retirement. However, the complaint does not allege Lewis either actually knew or should have known that there would be a change of coverage in the upcoming 2001 CBA. On these facts, the trial court held that the complaint failed to state a fraudulent misrepresentation claim, and we agree.

 The elements necessary for a fraudulent misrepresentation claim are: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance

on the misrepresentation; and (6) resulting injury. *Koken v. Steinberg,* 825 A.2d 723 (Pa.Cmwlth.2003), *appeal quashed,* 575 Pa. 103, 834 A.2d 1103 (2003).

Here, the trial court correctly concluded that the representations alleged to have been made by Lewis did not amount to representations of "material facts," as that phrase is used in identifying the elements of a cause of action for fraudulent representation, because representations of something that may happen in the future do not, at least as a general rule, constitute fraud. *Huddleston v. Infertility Center of America, Inc.,* 700 A.2d 453 (Pa.Super.1997).

As previously noted, the complaint is unclear as to whether the alleged fraudulent misrepresentations by Lewis to Appellants Boyd, Gnagey, Green, Hajel and Stern were also made to any of the other Appellants. In fact, paragraph 122 of the complaint only avers, "Defendant Lewis made false representations to *some* of the Plaintiffs ...." (emphasis added). Therefore, we agree with the trial court that Appellants Johnson, Kusch, LaVigne and Welsh failed to aver legally cognizable causes of action against Lewis for fraudulent misrepresentation.

Accordingly, we affirm the dismissal of Count IV of the complaint.[22]

---

*Stern, and Hajel* to retire early." Appellants' Brief at 20 (emphasis added).

**21.** These Appellants are not specifically identified in Count IV of the Complaint, which states only that "Defendant Lewis made false representations of fact to some of the Plaintiffs ... [b]y representing to the Plaintiffs that the School District would continue to pay for their healthcare benefits if the Plaintiffs elected early retirement...." Complaint ¶ 122(a). Presumably the Appellants referred to are Boyd, Gnagey, Green, Hajel and Stern since they were the only individuals who were offered an early retirement incentive plan.

**22.** Appellants argue, in the alternative, that the trial court abused its discretion by ignoring their request for leave to amend the complaint; at oral argument before this Court, Appellants explained that they would amend the complaint in only one way, *i.e.,* by specifically alleging that the Plan U health coverage was not the equivalent of Select Blue coverage. The dissent also suggests that this issue remains to be decided. We disagree and decline to consider this argument further since Appellants' proposed amendment would be futile in light of our determination that Appellants were never promised "vested coverage" under Plan U.

## CONCLUSION

All of Appellants' claims, including its Section 1983 action filed in federal court, were based upon the position that the District had promised to freeze the terms of their health insurance as they existed on the day of their retirement, thereby separating them from the rest of the members of the group in the health insurance plan, *i.e.*, the active employees. Such an extraordinary benefit simply cannot be found in the language of the relevant CBAs. What can be found is the commitment to continue the coverage that Appellants would have had if they had never retired prior to reaching the age of Medicare eligibility. In the absence of a valid contract claim by Appellants, their other theories must also fail.

Therefore, for the reasons set forth in the foregoing opinion, we affirm the order of the trial court insofar as it sustained Appellees' preliminary objections and dismissed Counts I, II, III and IV of the complaint.

Judge SMITH–RIBNER dissents.

### ORDER

AND NOW, this 13th day of September, 2006, the order of the Court of Common Pleas of Somerset County in the above-captioned matter, dated August 30, 2004, is hereby AFFIRMED.

## CONCURRING AND DISSENTING OPINION BY Judge FRIEDMAN.

The majority here affirms in its entirety the order of the Court of Common Pleas of Somerset County (trial court), which dismissed with prejudice the complaint (Complaint) filed by Claudia L. Boyd, Edgar W. Gnagey, Cordelia B. Green, William S. Hajel, Donna L. Johnson, Sandra Kusch, Larry LaVigne, Joyce D. Stern and William H. Welsh (collectively, Appellants) against the Rockwood Area School District (District) and Clair E. Lewis (together, Appellees). I concur with the result reached by the majority with respect to Counts III (equitable estoppel) and IV (fraudulent misrepresentation) of the Complaint; however, I respectfully dissent from the result reached by the majority with respect to Counts I (breach of contract) and II (intentional interference with contract) of the Complaint, which are predicated on an alleged contractual obligation of the District to Appellants.

### I. District's demurrer to Count I (breach of contract)

Appellants Boyd, Gnagey, Green, Hajel, LaVigne, Stern and Welsh (Appellant Teachers) are former District teachers and members of the Rockwood Education Association (REA),[1] who chose early retirement while one of three collective bargaining agreements (the 1991 CBA, the 1994 CBA and the 1997 CBA) between the District and the REA was in effect. Appellant Kusch, a former District secretary, and Appellant Johnson, a former District administrator, were not REA members; they retired under written District policies for support staff and administrators, respectively. In Count I of the Complaint, Appellants allege that they each decided to take early retirement in reliance on the District's promise to continue to pay their health insurance costs in accordance with the CBA or staff/administrator policy then in effect. Appellants further contend that, by the language in these CBAs and policies, Appellants' health coverage benefits

---

1. The REA is the exclusive collective bargaining representative for District employees included in the bargaining unit. The REA periodically negotiates CBAs between bargaining unit members and the District. Retired teachers are not members of the REA and take no part in these negotiations. (Complaint, ¶¶ 13–24.)

became vested, i.e., the District became contractually obligated to provide Appellants, at no cost, either Plan "U" Blue Cross, Blue Shield and Major Medical insurance (Plan U), or equivalent coverage with another carrier, until Appellants became eligible for Medicare. Appellants assert that the District breached its contractual obligations by unilaterally changing Appellants' health care plan to Select Blue Plan Option I (Select Blue) after the effective date of the 2001 CBA and requiring additional money each month for other plans.[2] (Complaint, ¶¶ 62, 98–100.)

### A. Appellant Teachers

The question at the heart of this case is whether Appellant Teachers were entitled to receive the same level of health insurance coverage provided to them by the CBAs in effect at the time they retired after those CBAs had expired. The majority agrees that, under the 1991, 1994, and 1997 CBAs, the District had a continued obligation to Appellant Teachers to pay the premium for some level of health insurance coverage. However, based on its reading of the CBAs at issue, the majority concludes that the District's obligation to Appellant Teachers changed in 2001, when a new CBA obligated the District to provide Select Blue, rather than Plan U, coverage on behalf of active employees and eligible retirees. Thus, the majority holds that, as a matter of law, Appellant Teachers failed to state a breach of contract claim against the District,[3] and, therefore, the trial court properly sustained the District's demurrer to Count I.

In reaching this conclusion, the majority agrees with the trial court that, under the

---

**2.** Appellant Teachers retired under one of three CBAs, each of which, in Article V, Paragraph A, obligated the District to provide Plan U, or equivalent coverage with another provider, to active teachers employed by the District. Further, in Article V, Paragraph F of each of these CBAs, the District agreed to continue to pay the premiums for this same health insurance coverage for certain retired teachers until they reach the age of Medicare eligibility. (Complaint, ¶¶ 25–40, 48–49.) After Appellant Teachers retired, the District and the REA negotiated the 2001 CBA, which replaced Plan U with Select Blue. Article V, Paragraph A, of the 2001 CBA provided, in pertinent part:

All employees *and eligible retirees* will be provided with Select Blue Plan Option I for such employee's [sic] and eligible dependent members of his/her family coverage effective July 1, 2001, or as soon thereafter as can be implemented by the Employer. This choice must be made no later than April 15th, immediately prior to the start of each fiscal year, which commences on July 1st. The Employer shall provide and pay the premium in full for Select Blue Plan Option I or, [sic] for equivalent insurance coverage with some other responsible insurance carrier, for each individual employee and the dependent members of his

family. The term "equivalent" as used aforesaid shall mean that such alternative insurance plan shall provide coverage equal to or better than the Blue Cross and Blue Shield plan.

(R.R. at 78a) (emphasis added). Article V, Paragraph F of the 2001 CBA provided, in pertinent part:

In the event an employee after thirty (30) years of service in teaching permanently retires from teaching *after [the] date of this contract* and prior to such retiring employee's attaining the age of eligibility for Medicare, the Employer agrees to continue to pay the premiums for such employee's medical insurance coverage benefits under Paragraph 'A' of this Article V above until such employee attains the age of eligibility for Medicare.

(R.R. at 82a) (emphasis added). At some point after March 14, 2001, the 2001 CBA was signed, and the District began applying its terms to Appellant Teachers.

**3.** To support a claim for breach of contract, a plaintiff must allege: (1) the existence of a contract between the plaintiff and defendant, including its essential terms; (2) a breach of duty imposed by the contract; and (3) damages resulting from that breach of duty. *CoreStates Bank, N.A. v. Cutillo,* 723 A.2d 1053 (Pa.Super.1999).

Third Circuit's decisions in *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, U.A.W. v. Skinner Engine Company,* 188 F.3d 130 (3d Cir.1999), and *Boyd v. Rockwood Area School District,* 105 Fed. Appx. 382 (3d Cir.2004), Appellants failed to allege facts sufficient to show that their retirement benefits had vested at their retirement, such that the District was precluded from later altering those benefits. In *Skinner,* the court held that "[b]ecause vesting of welfare plans constitutes an extra-ERISA commitment, *an employer's commitment to vest such benefits is not to be inferred lightly and must be stated in clear and express language." Skinner,* 188 F.3d at 139 (emphasis added). In *Boyd,* the court held that Appellants "should have known that their health care benefits as retirees were subject to change pursuant to subsequent [CBAs where t]he agreement they rely on ... specifically stated that different health care insurance could be substituted *as long as it was equivalent to the Plan U ... coverage." Boyd,* 105 Fed. Appx. at 385 (emphasis added). Quoting various portions of the relevant CBAs, the majority attempts to demonstrate that the language therein defeats Appellants' claim that they had a "vested" right in Plan U coverage under any of the CBAs. (Majority op. at 1166.)

However, I believe that the majority either misconstrues or misstates Appellants' argument. Appellant Teachers do not assert absolute entitlement to Plan U coverage; in fact, they *agree* that the CBAs under which they retired guaranteed benefits under *either* Plan U *or* an equivalent plan from another responsible carrier. Thus, the issue is not whether the CBAs permit the District to replace Plan U but whether Select Blue constitutes the equivalent coverage promised. Appellants concede that their Complaint fails to expressly allege that Select Blue coverage is not equivalent to Plan U coverage; however, for purposes of preliminary objections, Appellants are entitled to have all reasonable inferences from the Complaint admitted as true. I agree with Appellants that where the same insurance company[4] provides both Select Blue and Plan U, and where it is alleged that Appellants must pay a higher premium to maintain Plan U coverage, it reasonably can be inferred from the Complaint that the two plans cannot be equivalent.

In addition, I believe the majority's interpretation of the plain language in the CBAs is seriously flawed. As the majority explains, Article V in each of the CBAs at issue established health insurance benefits for the term of each CBA for both current (Paragraph A) and retired (Paragraph F) employees. Referring first to Paragraph A of the various CBAs, the majority quotes the 1994 CBA, which provided, in relevant part:

> The Employer shall provide and pay the premium in full for Plan "U" Blue Cross, Blue Shield and Major Medical, including catastrophic (the limit of which catastrophic insurance will be raised *for the balance of the term of this agreement* from $250,000.00 to a $1,000,000.00 limit) insurance coverage, or, for equivalent insurance coverage with some other responsible insurance carrier, for each individual employee and the dependent members of his family.

(Complaint, ¶ 29, R.R. at 36a) (emphasis added). The majority notes further that

---

**4.** I would point out, and the majority concedes, that Plan U and Select Blue are both types of Blue Cross/Blue Shield coverage. (Majority op. at 1162.) Thus, Select Blue insurance coverage is not "with some other responsible insurance carrier" as promised under the relevant CBAs.

Article V, Paragraph A of the 1997 CBA authorizes a committee to replace Plan U with another plan during the term of the CBA. (Majority op. at 1166.) The majority then concludes that the foregoing contractual language "indicates that the Plan U coverage *contemplated in Paragraph A of Article V* was subject to change, either after the 'balance of the term' of the 1994 CBA had expired,[5] or during the term of the 1997 CBA." (Majority op. at 1166) (emphasis added). ·

I do not disagree that Article V, Paragraph A was subject to such change. Clearly, if Appellant Teachers were still teaching, or if they had retired after the 2001 CBA became effective, they would be subject to the change to Select Blue health coverage in Article V, Paragraph A of that CBA. However, as the majority acknowledges, Article V, Paragraph A of the 1991, 1994 and 1997 CBAs relates only to *currently employed teachers;* it is Article V, *Paragraph F* that relates to teachers retiring during the term of those CBAs. *To these retirees,* including Appellant Teachers, the District made a promise that stated in plain English:

> In the event an employee after 30 years of service in teaching permanently retires from teaching after date of this contract and prior to such retiring employee's attaining the age of eligibility for Medicare, the Employer agrees to continue to pay the premiums for such Employee's Blue Cross, Blue Shield and major medical or equivalent insurance coverage benefits under *paragraph "A" of this Article V above* until such em-

ployee attains the age of eligibility for Medicare.

(Complaint, ¶ 30, R.R. at 37a) (emphasis added).[6]

As required under *Skinner,* this language expressly states the District's contractual commitment to provide employees who retired under the 1991, 1994, and 1997 CBAs with the *same* health coverage benefits provided to active employees in Article V, Paragraph A *of the CBA in effect at the time they retired,* and it also explicitly guarantees that payment for those benefits will continue until a specific point in time. Because the coverage under Article V, Paragraph A of the 1991, 1994 and 1997 CBAs was Plan U or its equivalent, the only rational construction of the language in Article V, Paragraph F of those agreements is that the District contracted to provide Appellant Teachers with Plan U or equivalent coverage until they became eligible to receive Medicare.

The majority's contrary conclusion can be supported only by reading the words "coverage benefits under *Paragraph A of this Article V above* " as meaning "coverage benefits under *any* part of *any* CBA executed at *any* time." I believe that such an interpretation has no support in the plain language of the CBAs. Moreover, because I believe that the language of Article V, Paragraph F satisfies the specificity requirements of *Skinner,* I cannot agree with the majority that the level of coverage for Appellant Teachers could change each time a new CBA was signed.

In addition, the majority overlooks the fact that the court in *Skinner* focused on

**5.** I would note that the 1994 CBA's phrase "for the balance of the term of this agreement" refers only to the length of time that the limit for catastrophic insurance would be raised; it does not refer to Plan U coverage in general. The 1997 CBA excludes this phrase and provides for Plan U,· including cata-

strophic insurance coverage with a limit of $1,000,000.00 (R.R. at 47a.)

**6.** This quote is from Article V, Paragraph F of the 1994 CBA. The 1991 CBA and the 1997 CBA contained this same language. (Complaint, ¶¶ 33–34, 49; R.R. at 47a–49a.)

the language and structure specific to the collective bargaining agreements in that case. However, the CBAs here differ from those in *Skinner* in several critical aspects.[7] Significantly, in *Skinner*, the court discerned no language in the new collective bargaining agreement that would preclude its application to retirees under the prior agreement. The same cannot be said in the present case. The term "eligible retirees" in Article V, Paragraph A of the 2001 CBA has been construed to make that CBA applicable to Appellant Teachers, but the term is not defined in that agreement. I would note that Article V, Paragraph F of the 2001 CBA explicitly provides for *continuing* Select Blue health benefits to employees retiring "*after the date of this contract* and prior to *such* retiring employee's attaining the age of eligibility for Medicare." (R.R. at 82a) (emphasis added). Because each Appel-

lant here retired *prior* to the July 1, 2001, effective date of the 2001 CBA and, thus, *never* received Select Blue as active employees, it is unreasonable to consider them "eligible retirees" subject to the change reflected in the 2001 CBA.[8] This is particularly true because only those teachers who retired *after* the effective date of the 2001 CBA were represented as REA members when the terms of that CBA were negotiated.

As previously stated, I believe that the trial court and majority mistakenly focus on language in the CBAs that allowed the District to replace Plan U with a successor health plan, drawing on the Third Circuit's reasoning in *Boyd* that Appellants were clearly aware of the possibility of different, though equivalent, health care coverage in the future. However, I repeat, Appellant

---

7. For example, in *Skinner*, the court determined that, because the language in the collective bargaining agreements did not specify that retiree benefits would continue for the life of the retiree, it was equally reasonable to interpret the language to mean that the benefits "will continue" only until expiration of the agreements. In contrast, the CBAs at issue here explicitly provide a time period for continuing benefits, "until such employee attains the age of eligibility for Medicare." (R.R. at 36a–37a, 48a.) In addition, the court in *Skinner* noted that the term "will continue" was not given prospective meaning in the bargaining agreements, whereas under the CBAs in this case, the District agrees to continue to pay premiums for Plan U or equivalent health insurance prospectively to retirees. In *Skinner*, the court observed that the provision at issue applied to both active employees and retirees and reasoned that, because benefits clearly did not vest for active employees, it was only reasonable to conclude that benefits for retirees also did not vest. Here, however, the CBAs do distinguish between active employees and specific retirees. One paragraph of the CBAs relates to *current employees* and states that Employer *shall provide and pay* the premium in full for Plan U, whereas a separate paragraph of the CBAs relates to *retirees*

and states that Employer *agrees to continue to pay* the premiums for Plan U. Finally, in *Skinner*, the court found that there was no competent evidence that the employer affirmatively represented to the retirees that their benefits could not be modified or terminated. In contrast, Appellants' Complaint specifically alleges that the District affirmatively represented to Appellants that their Plan U (or equivalent) benefits would not be modified or terminated before they reached the age of Medicare eligibility.

8. I note that the District seems to have fixed the current problem with the insertion of the words "and eligible retirees" in Article V, Paragraph A of the 2001 CBA. *As of the date that the 2001 CBA became effective*, the District's premium payment obligation to both active employees *and eligible retirees* (i.e., those retiring after the 2001 CBA as referred to in Article V, Paragraph F of the 2001 CBA) changes as the coverage in Paragraph A changes. By interpreting the earlier CBAs this same way, the majority treats the phrase "and eligible retirees" in the 2001 CBA as mere surplusage, thereby violating a well-settled rule of contract construction. *Morris v. American Liability & Surety Co.*, 322 Pa. 91, 185 A. 201 (1936).

Teachers *agree* that the District reserved the right to replace Plan U with *equivalent* coverage with *some other* responsible insurance carrier. What they allege is that the Select Blue coverage in the 2001 CBA is neither from another carrier nor equivalent to Plan U. I believe that this issue remains to be decided.

Accordingly, for these reasons, I would reverse the dismissal of Count I with respect to those Appellants who retired under the various CBAs.

### B. Other District Retirees

As to the District's demurrer to the causes of action for breach of contract filed by Appellants Kusch and Johnson, they each aver that the District agreed to provide health insurance coverage in accordance with the written staff/administrator policies in effect on the date of their retirement at no cost until they reach the age of Medicare eligibility. (Complaint, ¶¶ 44, 47.) No further specificity is provided, and Appellants failed to attach copies of these alleged written policies to the Complaint and failed to state who made these (presumptively) oral agreements with Kusch and Johnson.

In the case of both Kusch and Johnson, the trial court sustained the District's demurrer to Count I of the Complaint for the same reason given for dismissing Appellant teachers' breach of contract claims, i.e., failure to meet the *Skinner* requirements. Based on my prior discussion, I would conclude that *Skinner* does not defeat the claims of Kusch and Johnson and that their allegations, taken as true, are sufficient to overcome the demurrer.

However, in addition to their demurrers, the District and Lewis each filed preliminary objections under Pa. R.C.P. No. 1028(a)(2), alleging failure to conform to Pa. R.C.P. No. 1019 by, *inter alia,* failing to plead with adequate specificity and by failing to attach a copy of the alleged writings upon which the claim is based.[9] (R.R. at 127a–31a, 138a–42a.) Appellees also filed preliminary objections in the nature of a motion for a more specific pleading under Pa. R.C.P. 1028(a)(3). (R.R. at 131a–33a., 148a–53a.) Having dismissed the breach of contract claims against Kusch and Johnson based on demurrer, the trial court did not address these additional objections.

Accordingly, I would vacate the dismissal of Count I as to Appellants Kusch and Johnson and remand to the trial court for consideration of Appellees' additional preliminary objections.

### II. *Lewis's demurrer to Count II (intentional interference with contract)*

In affirming the trial court's order sustaining Lewis's demurrer to Count II of Appellants' Complaint, the majority adopts the trial court's reasoning and concludes that the pleading fails to state a claim because it is premised on a contract as

---

**9.** Pa. R.C.P. No. 1019(a) requires plaintiffs to plead the material facts that support the claims. A complaint is sufficiently specific if it provides enough facts to enable the defendant to frame a proper answer and prepare a defense. *Commonwealth ex rel. Milk Marketing Board v. Sunnybrook Dairies Inc.*, 29 Pa. Cmwlth. 210, 370 A.2d 765 (1977). Moreover, Pa. R.C.P. No. 1019(i) provides that, when a claim is based upon a writing, the pleader shall attach a copy of the writing to the complaint or, in the event that the writing is not accessible, the pleader shall state as much, together with the reason. Based on the plain language of the Complaint, the claims of Appellants Johnson and Kusch are based in part upon written agreements between these Appellants and the District; nevertheless, the Complaint neither attaches these agreements nor explains why they are not provided.

interpreted by Appellants that never, in fact, came into existence. However, as discussed previously, I do not believe that the trial court's dismissal of Count I in its entirety was proper.

With respect to the contracts between the District and Appellants Boyd, Gnagey, Green, Hajel and Stern, the Complaint alleges that: Lewis encouraged and assisted these Appellants to retire before reaching the age of Medicare eligibility; Lewis represented to them that, in exchange for their early retirement, the District would continue to provide health insurance in accordance with the 1997 CBA; and these Appellants decided on early retirement in reliance on that promise. (Complaint, ¶¶ 54, 59, 62.) The Complaint further alleges that, despite Lewis' knowledge of the rights of these Appellants under their early retirement agreements, Lewis intentionally interfered with their contractual rights to the health insurance benefits specified in the 1997 CBA by: (1) directing that the 2001 CBA contain the language "eligible retirees" in Article V, Paragraph A, despite the fact that such language was not approved by the rank and file of the REA; (2) suppressing any support of Appellants by the REA; and (3) convincing the Board of Directors to ratify his conduct. (Com-

plaint, ¶¶ 87–91, 104–09, 111.) Taking these allegations as true, as we must at the preliminary objection stage of the proceedings, I would agree that these particular Appellants have alleged all the elements of an intentional interference with contract action against Lewis.[10] On the other hand, as the majority states, the Complaint makes no allegation of purposeful action by Lewis intending to harm contractual relations between the District and Appellants Johnson, Kusch, LaVigne and Welsh.[11]

Accordingly, I would affirm the dismissal of Count II as to Appellants Johnson, Kusch, LaVigne and Welsh, but I would reverse the dismissal of Count II as to Appellants Boyd, Gnagey, Green, Hajel and Stern.

Finally, because I believe the trial court erred in dismissing Appellees' remaining preliminary objections as moot, I would remand for the trial court to consider those preliminary objections.[12]

10. The elements of a cause of action for intentional interference with contract, as set forth in *Strickland v. University of Scranton*, 700 A.2d 979, 985 (Pa.Super.1997), are:

> (1) the existence of a contractual ... relation between the complainant and a third party;
> (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring;
> (3) the absence of privilege or justification on the part of the defendant; and
> (4) the occasioning of actual legal damage as a result of the defendant's conduct.

11. Indeed, as noted by the majority, Appellants appear to accept that the claims against

Lewis are insufficient with respect to these Appellants.

12. In addition to its preliminary objection in the nature of a demurrer, the District objected to Appellants' Complaint under: Pa. R.C.P. No. 1028(a)(5) (failure to join a necessary party); Pa. R.C.P. No. 1028(a)(2) (failure to comply with Pa. R.C.P. Nos. 1019(a), 1019(f), 1019(h) and 1019(i)); and Pa. R.C.P. No. 1028(a)(3) (motion for a more specific pleading). (R.R. at 118a–33a.) In addition to his preliminary objection in the nature of a demurrer, Lewis objected to Appellants' Complaint under: Pa. R.C.P. No. 1028(a)(1) (lack of subject matter jurisdiction); Pa. R.C.P. No. 1028(a)(2) (failure to conform to rule of law or rule of court or for inclusion of scandalous

and impertinent matter); Pa. R.C.P. No. 1028(a)(5) (failure to join a necessary party); and Pa.R.C.P. No. 1028(a)(3) (motion for a more specific pleading). (R.R. at 136a–53a.)